UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

COMPUTERIZED THERMAL IMAGING, INC.
a Nevada corporation,

      Plaintiff,

vs.

SELECT CAPITAL ADVISORS, INC., a
Florida corporation, RONALD G.
WILLIAMS, TRACY WILLIAMS, LYLE
MORTENSON, BARRY GLOBERMAN, MANNY
LOPEZ, WALTER KOLKER ARI GOLDSTEIN,
SHELDON TAIGER, ARITEX, LTD, a
Bahamian corporation, REG -S-
INTERCONTINENTAL, LTD, BANCO
COOPERATIVO COSTARRICENSE, MARDI
INTERNATIONAL CORPORATION, PEGASUS
FINANCIAL SERVICES CORP., a Florida
corporation, Y.L. HIRSCH, LOCKWOOD
RESOURCES, LTD.,

      Defendants.
_____/

CIVIL ACTION
CASE NO.:

# 97-3960

## CIV-NESBITT

### MAGISTRATE JUDGE JOHNSON

## COMPLAINT

**Plaintiff**, COMPUTERIZED THERMAL IMAGING, INC. ("CTI"), sues **Defendants**, SELECT CAPITAL ADVISORS, INC. ("Select"), a Florida corporation, RONALD G. WILLIAMS ("Williams"), TRACY WILLIAMS ("Tracy Williams"), LYLE MORTENSON ("Mortenson"), BARRY GLOBERMAN ("Globerman"), MANNY LOPEZ ("Lopez"), WALTER KOLKER ("Kolker"), ARI GOLDSTEIN ("Goldstein"), SHELDON TAIGER ("Taiger"), ARITEX, LTD. ("ARITEX"), a Bahamian corporation, REG -S- INTERCONTINENTAL, LTD. ("RSILL"), BANCO COOPERATIVO COSTARRICENSE ("BANCOOP"), MARDI INTERNATIONAL CORPORATION ("MARDI"), PEGASUS FINANCIAL SERVICES CORP. ("Pegasus"), a Florida corporation, Y.L. HIRSCH, ("Hirsch"),

1

LOCKWOOD RESOURCES, LTD., ("Lockwood") and alleges as follows:

### JURISDICTION

1.     This action arises under the Federal Securities Act of
1933, 15 U.S.C. § 78a et seq. ("The 1933 Act") the Securities
Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 77a et seq. and
the rules and regulations promulgated thereunder, including, but
not limited to section 17 of the 1933 Act, section 10(b) of the
Securities Exchange Act of 1934, Rule 10-b5; section 15(c)(1),
section 29 of the Exchange Act and Regulation "S" of the Securities
Exchange Commission.  This Court has jurisdiction pursuant to 28
U.S.C. §1331, and 28 U.S.C. §1332.  Jurisdiction over the pendent
claims is proper under 28 U.S.C. §1367.    There is complete
diversity of the parties.

2.     Plaintiff, Computerized Thermal Imaging, Inc. ("CTI"), is
a corporation organized under the laws of the State of Nevada,
having its principal place of business in the State of Oregon.

3.     Defendant Select Capital Advisors, Inc., ("Select") is a
corporation organized under the laws of the State of Florida.

4.     Defendant Ron G. Williams ("Williams") is the principal
officer, director and controlling shareholder of Select and is
Chairman of the Board of Directors.  Defendant Ron G. Williams is
a citizen of the State of Florida.

5.     Defendant, Tracy Williams, ("Tracy") is a citizen of the
State of Florida, is a principal of Defendant Select and acts as
the administrator of the corporate activities of Defendant Select,

2

as the repository of funds from the business activities of Defendant Ronald Williams, and as his alter ego for financial purposes.

6.    Defendant Lyle Mortenson, ("Mortenson") is a citizen of the State of Florida, is the Chief Financial Officer of Select, is Trustee of the Williams Children's Trust, operates and controls with Tracy Williams, the daily financial activities of Select.

7.    Defendant Barry Globerman ("Globerman") is an attorney licensed to practice law in New York, a citizen of New York, is a principal of Select and of ARITEX and at all material times acted as Escrow Agent for Select in connection with the activities set forth below.

8.    Defendant, Manny Lopez ("Lopez"), a citizen of the State of Florida, is the principal of Defendant Pegasus, the agent for RSIIL, BANCOOP, and MARDI and was, for material purposes herein and as it relates to this transaction the Senior Vice President of Select for Latin American Operations.

9.    Defendant, Walter Kolker ("Kolker"), a citizen of the State of Florida and was for material purposes herein the Executive Vice President and "partner" of Select with a financial interest in the transactions set forth below.

10.    Defendant, Ari Goldstein ("Goldstein"), a citizen of the State of New York, was, for material purposes herein, the Agent for Defendant Select and the agent for Defendants Hirsch and Lockwood.

11.    Defendant   ARITEX,   LTD.,   ("ARITEX"),   a   Bahamian corporation, for material purposes herein acted as an agent for

**3**

Select, received compensation for the sale activities alleged herein.  ARITEX conducts business in the Bahamas and Florida and acted as a repository of funds with respect to this transaction.

12.  Defendant Sheldon Taiger ("Taiger") a citizen of the State of Florida is a principal of Select and for material purposes acted for and with Select with respect to the activities alleged herein.

13.  Defendant, Reg -S- Intercontinental Investments, Ltd. ("RSILL"), (also herein "Buyer") is a corporation organized under the laws of the Bahamas, doing business in the Bahamas and the State of Florida.

14.  Defendant, Mardi Intercontinental Corporation ("MARDI"), (also herein "Buyer") is a corporation organized under the laws of Panama doing business in the Bahamas and the State of Florida.

15.  Defendant Banco Cooperativo Costaricensse ("BANCOOP") (also herein "Buyer") is a corporation organized under the laws of Costa Rica.

16.  Defendant, Y.L. Hirsch ("Hirsch") (also herein "Buyer") is an Israeli citizen.

17.  Defendant, Lockwood Resources, Ltd. ("Lockwood") (also herein "Buyer") is a British Virgin Islands corporation conducting business in the Virgin Islands.

18.  Defendant, Pegasus Financial Services Corp. ("Pegasus") is a Florida corporation acting as authorized representative for RSIIL, BANCOOP, and MARDI.  It is controlled by Defendant Lopez, who, was for material purposes a principal and agent of both Select

**4**

and an agent for RSIIL, BANCOOP, and MARDI.

19.   The amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000,000.

## VENUE

20.   Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because defendants Select, Williams, Tracy, Mortenson, Globerman, Lopez, Kolker, Goldstein, Taiger, ARITEX, Pegasus, RSIIL, BANCOOP, MARDI, all conducted business in this judicial district and the claims relating to those defendants arose here. A substantial part of the events or omissions giving rise to the claims occurred in this judicial district.   Defendants Select, Williams, Tracy Williams, Mortenson, Lopez, Kolker, Taiger are all citizens and residents of this judicial district.   Venue also is proper under section 27 of the Exchange Act.

## ALLEGATIONS AS TO ALL COUNTS

21.   Plaintiff   CTI   is   in   the   business   of   research, development, manufacturing and selling medical diagnostic imaging equipment.

22.   To broaden its business opportunities, Plaintiff needed a  substantial  capital  infusion  and  credit  line  of  equipment financing.

23.   In March of 1997, Plaintiff was introduced to Select and Ron G. Williams, its principal officer, director and controlling shareholder.   Select, Ron Williams, Tracy Williams, Mortenson,

Kolker and Taiger represented to CTI that they had the experience, reputation and resources to raise over $206,000,000. in investment capital and equipment financing for Plaintiff through a variety of alleged legitimate sources and legal techniques.  Plaintiff CTI and Select signed a "firm underwriting agreements".  Plaintiff paid Select a deposit of $10,000.00 for these services.

24.  In April 1997, Select and CTI based upon the representations of Select and Williams, Tracy Williams, Mortenson and Kolker signed a "term sheet" wherein Select agreed to immediately raise an amount (net of expenses) of $1,500,000.00 in the form of a discounted bond (debenture) securities offering. Select and Williams, Mortenson and Kolker represented that they had a "firm commitment" for $1,500,000.00 and also had enough personal resources to fund the commitment, or any short fall.  Select and CTI entered into various written and oral agreements., one of which is attached hereto as Exhibit "A" and "B".

25.  From April 1997 through July, 1997, Select and Defendants Williams, Tracy Williams, Taiger, Mortenson, Lopez, Kolker, Goldstein, and Globerman  began a process of allegedly raising money ($530,000) in the form of convertible debentures to be issued solely to and purchased by alleged foreign sources through a mechanism permitted by the federal Securities and Exchange Commission under "Regulation S." That regulation requires, among other things, that the legal and beneficial owners of the securities must be foreign and not effectively controlled by any domestic person or entity.

6

26. Pursuant to a so-called "Offshore Securities Subscription Agreement" dated April 15, 1997, allegedly issued pursuant to Regulation S, RSIIL, BANCOOP, MARDI, Hirsch and Lockwood (also referenced herein after as "Buyers") agreed to purchase subordinated, redeemable debentures convertible into unregistered stock. (See Exhibit "C" attached hereto).

27. Defendant Lopez and Goldstein facilitated the sale of the debentures both as agents for the Buyers and as agent for Select. Lopez was the Vice President of the Latin American division of Select.

28. Further, Buyers represented to CTI the (among other things) in the subscription:

   a.  "Buyer is not a natural person and it not organized under the laws any jurisdiction within the United States, was not formed by a U.S. Person (as defined in Section 901(o) of Regulation S) for the purpose of investing in Regulation S securities and is not otherwise a U.S. Person.  Buyer is not and on the closing date will not be, an affiliate of Seller;

   b.  At the time the buyer order was originated, Buyer was outside the United States and is outside of the United States as of the date of the execution and delivery of this Agreement;

   c.  No offer to purchase the Debentures or the common stock of Seller issuable upon conversion of the Debentures (collectively, the "Securities"), was made by Buyer in the United States;

   d.  Buyer is purchasing the Securities for its own account and Buyer is qualified to purchase the Securities under the laws of its jurisdiction of residence, and the offer and sale of the Securities will not violate the securities of other laws of such jurisdiction;

   e.  All offers and sales of any of the Securities by Buyer prior to the end of the Restricted Period (as hereinafter defined) shall be made in compliance with any applicable

7

*securities laws of any applicable jurisdiction and in accordance with Rule 903 and 904, as applicable, of Regulation S or pursuant to registration of securities under the 1933 Act of pursuant to an exemption from registration. In any case, none of the Securities have been or will be encumbered, offered, sold or otherwise transferred by Buyer to, or for the account or benefit of, a U.S. person or within the United States until after the end of the one year period commencing on the later of (x) the date of closing of the offering of the Securities or (y) the date of the first offer of the Securities to persons other than distributors (the "Restricted Period") as calculated pursuant to Regulation S and certified by Buyer to Seller and thereafter only pursuant to a Registration Statement or an applicable exemption from the registration provisions of the 1933 Act;*

f.  *The transactions contemplated by this Agreement (a) have not been and will not be pre-arranged by Buyer with a purchaser located in the United States or a purchaser which is a U.S. Person, and (b) are not and will not be part of a plan or scheme by Buyer, to evade the registration provisions of the 1933 Act;*

g.  *Buyer understands that the Securities are not registered under the 1933 Act and are being offered and sold to it in reliance on specific exclusions from the registration requirements of Federal and State securities laws and that Seller is relying upon the truth and accuracy of the representation, warranties, agreements, acknowledgements and understandings of Buyer set forth herein on order to determine the applicability of such exclusions and the suitability of Buyer and any purchaser from Buyer to acquire the Securities; . . ."*

29.  Upon information and belief, the representations above stated were neither true nor accurate at the time they were made and were known by the Buyers to be false. The sales to the Buyers were made domestically through unlicensed domestic agents Defendants Lopez, Pegasus, ARITEX, Goldstein and others under a scheme and through other techniques to unlawfully avoid the requirements of Regulation S.

30.  Aided and abetted by and in conspiracy with its agents, the Defendants Williams, Mortenson, Globerman, Kolker, Lopez,

Pegasus and Goldstein, Select Capital contrived a change in the text of the subscription agreement for the debentures so that CTI believed that the unregistered stock to be issued would not be convertible until after a period of one year had expired.  Select Capital's agents and other named defendants with the knowledge, assistance and connivance of Select and Williams and others transposed the substantive text so that the Buyers' version of the text represented a sale restriction of only 45 days, unknown and unacceptable to CTI.  Defendant Globerman as agent for Select and as Escrow Agent circulated only the signature pages to CTI, not the full text of the debentures.

31.  On or after June 1997, the Buyers claimed immediate entitlement to registered stock and attempted to convert the stock at a time when, upon information and belief the stock price of CTI was kept artificially low by persons associated with some of the defendants.  Upon information and belief (although investigation is continuing by the Plaintiff and governmental agencies), the artificially low price of the stock was related to activities of Select, its agents, some agents of the Buyers and the Buyers themselves.

32.  Through this device of market manipulation, the Buyers could convert the stock at a price more than 50% lower than the true market value of the stock thereby reaping and reap a great reward to the disadvantage of both CTI and other shareholders of CTI.

33.  Plaintiff refused to issue the requested stock.  Demand

and threat of litigation was made by one or more representatives of the Buyers for freely tradable common stock.

34. Plaintiff believes that there has been:

(a) Fraudulent activity by Select, Ron Williams, Tracy Williams, Mortenson, ARITEX, Globerman, Lopez, Kolker, Goldstein and Taiger in connection with the issuance of the debentures.

(b) That there was no "meeting of the minds" between Plaintiff and Buyers in connection with the issuance of the debentures.

(c) That the debentures were issued to Buyers in violation of Regulation S. and other rules and regulations and laws of the United States.

(d) That there were misrepresentations of material fact by the Buyers and the Buyer's agents to Plaintiff.

(e) That those persons representing Buyers including Lopez and Goldstein were acting as Broker Dealers although unlicensed and in violation of federal law.

(f) That commissions paid to Select, Williams, Tracy Williams, Mortenson, ARITEX, Globerman, Lopez, Kolker, Goldstein, and Taiger for the sale of the debentures and on some of the stock sales were in violation of the laws, rules, regulations of the Securities Exchange Commission and of the 1933 Securities Act and 1934 Exchange Act.

## COUNT I
### (Claim for Breach of Contract Against Select)

35. The preceding allegations are alleged herein.

36. CTI and Select acknowledged "the completion of the due diligence period" on April 23, 1997. Select was obligated to prepare an equity private placement to raise $6 Million to commence raising funds within thirty days after the completion of the due diligence period. Select made no progress toward the fulfillment of this obligation even to commence the preparation of the private placement memorandum within such period.

37.   The Commitment contained a noncircumvention obligation to prevent CTI from using competitive, alternative financing sources. When it was obvious to the parties that the equity private placement could not raise initial funds by June 1997, as required by CTI for its clinical trials, Select offered to arrange senior debt on a convertible basis to raise the $1.5 Million which was necessary for certain clinical trials based upon the business plan of CTI at the time. Select represented that the $1.5 Million would be completed by April 10, 1997.

38.   Select was completely aware of the urgent necessity of CTI for maintaining its operations.   Moreover, Select was made aware in the due diligence period of the exact amount required to commence clinical trials of its equipment as approved by the Federal Drug Administration. CTI had not commenced clinical trials pending confirmation from Select on its representation that the funds would be available timely pursuant to the senior debt arrangement.   Select at one point told CTI to commence clinical trials. In reliance upon that representation, CTI has now incurred additional obligations which has damaged the clinical trial program.

39. Select confirmed, before the completion of the due diligence period, the amount of equity and bond financing necessary, including the rate of expenditure CTI required.   Select represented its ability to deliver such amount of the bond placement as required within forty-five (45) days after the completion of the due diligence period, which representation was

11

not true and was known not be true by Select when made.

40.    Pursuant to the Commitment, CTI was under obligation not to circumvent Select, without its consent, by obtaining financing referenced in the Commitment from any other party.  When CTI was presented with an alternative senior debt arrangement, on slightly more favorable terms, CTI informed Select, and Select advised CTI not to accept that proposal and to remain with Select for all of its financing requirements pursuant to paragraph 4 of the Commitment.  CTI relied upon Select's representation that it would deliver the bond placement within forty-five days and the senior debt arrangement within a few weeks after the completion of the due diligence period.   Those representations have proven to be false.

41.    Select is in breach of its obligation to provide CTI with a bridge loan in the amount of $2 Million to "fund at the end of the due diligence period . . ." Select specifically waived in writing the requirement for security for this bridge loan.  CTI did request this bridge loan, and Select remains in default because no such arrangement has been completed.

42.    Select has not produced any plan or evidence of its capability of delivering the equity and debt investment capital described in the Commitment.

43.    Select made representations before CTI executed the senior debt financing that Select would not permit its investors in the convertible debt to flood the market or impair the market value of the corporation's stock.   Select represented that it would absorb any attempts to liquidate such shares if the efforts to

**12**

liquidate were impairing the market value of the shares. Instead, Select has refused to offer any coordination efforts, much less financial assistance, with the professionals representing the various investors and CTI to complete the financing, as set forth in covenants in the Commitment.

44. Select failed to coordinate the financing and assure funding within the committed time frame from the senior debt investment, despite repeated assurances to CTI that the money has been committed and that the investment would be completed within the week.

45. Select has failed to write and issue to the appropriate wire services any press releases concerning recent developments or future plans of CTI, as represented and required. Select has taken compensation from CTI in exchange from its promises and covenants under the Commitment, which are now in default. CTI has paid a $10,000.00 non refundable charge to defray Select's expenses in association with securing the investment capital.

46. CTI has received information from brokers investing in the senior debt offering that Select compensated the agents of the investors without disclosure to the investors, which may result in damage to CTI and constitutes a violation of law.

47. Select agreed to indemnify and hold harmless CTI from and against any losses, claims, damages or liabilities relating to or arising out of the activities of Select in connection with the Commitment, including any claims or damages related to or arising out of any misrepresentations made by Select. Select agreed to

13

indemnify CTI for all reasonable expenses (including counsel fees) incurred in connection with investigating, preparing or defending any action or claim, whether or not in connection with pending or threatened litigation, or administrative proceedings. Instead, Select has refused to respond to any of the claims by its investors under the senior debt offering of documents which were not approved by CTI.

48. Plaintiff CTI has performed all conditions on its part to be performed and Select has breached each and every agreement with Plaintiff.

49. CTI has been damaged in an amount in excess of $75,000.000.

## COUNT II

### (Claim for Violation of Section 10(b), Rule 10 B-5 against Select and Ron Williams, Tracy Williams, Mortenson, Globerman, Lopez, Kolker, ARITEX, Goldstein and Taiger)

50. The preceding allegations are realleged herein.

51. Select and Ron Williams, Tracy Williams, Mortenson, Globerman, ARITEX, Lopez, Kolker, Goldstein and Taiger defrauded CTI with scienter in violation of section 10(b) of the 1934 Securities Exchange Act and Rule 10 B-5 by (from April 1997 through September 1997):

      (a) Deliberately, falsely, and intentionally or recklessly misrepresenting their ability to raise capital, upon which representation CTI relied to its great detriment.

      (b) Intentionally or recklessly omitting to state that Ron Williams has been under indictment for fraud in connection with the raising of capital and various payments to agents for the investors and was under investigation for various other violations of

14

Securities and Investment laws.

(c) Intentionally or recklessly failing to reveal the true nature and territorial origin of the Buyers' capital.

(d) Intentionally or recklessly failing to reveal that its agents had switched material terms and conditions in the final documents relating to the existence of the defendants.

(e) Failing to state material facts which, if stated would have caused Plaintiff, not to enter into the transaction, not to issue the debentures and not to accept Buyers Capital.

52. The activities of the defendants Select, Ron Williams, Tracy Williams, Mortenson, Globerman, Lopez, ARITEX, Kolker, Goldstein and Taiger were fraudulent or manipulative activity in connection with the purchase and sale of securities governed by federal law.

53. Plaintiff CTI relied to its great detriment on the misrepresentations and omissions of material fact by these defendants.

54. Defendants Select, Ron Williams, Tracy Williams, Mortenson, Globerman, ARITEX, Lopez, Kolker, Goldstein, and Taiger greatly benefitted by this artifice in that they received commissions and payments to which they were not entitled.

55. Plaintiff CTI has been damaged in excess of $75,000.00.

## COUNT III
## (Claim for Recission under section 29(b) of the Exchange Act)

56. All preceding allegations are realleged.

57. Plaintiff believes that Buyers, REG -S- INTERCONTINENTAL, LTD, BANCO COOPERATIVO COSTARRICENSE, MARDI INTERNATIONAL

15

CORPORATION, Y.L. HIRSCH, LOCKWOOD RESOURCES, LTD., entered into the purchase transaction for the purchase of debentures based upon:

(a) Fraud of Select assisted, aided and abetted by defendants Ronald Williams, Tracy Williams, Mortenson, Lopez, Globerman, ARITEX, Kolker, Goldstein, and Taiger.

(b) Violations of Regulation S by the Buyers.

(c) Misrepresentations by Select, Ronald Williams and Globerman of the intended terms and conditions intended by CTI in the Registration of convertible securities.

(d) Fraud or reckless conduct of the Buyers agents, Lopez, Pegasus and Goldstein.

(e) Violations of various securities laws by Buyers or their Agents including Lopez, Pegasus, and Goldstein.

(f) Unlawful commissions paid to unlicensed Broker dealers.

58. Pursuant to the Securities Act of 1933, the issuance of the debentures to Buyers was not exempt, was unlawful, was based upon misrepresentation and is void as a matter of law.

59. Plaintiff demands recission pursuant to §29(b) of the Exchange Act, section 10(b) of the Exchange Act and Rule 10 B-5 of the Securities Exchange Commission and common law.

60. Plaintiff demands recission of the transaction less damages as awarded by this Court, costs, fees paid, and reasonable attorney's fees as against all defendants.

61. Plaintiff has no adequate remedy at law.

## COUNT IV
### (Claim for Misrepresentations Against Buyers, RSIIL, BANCOOP, MARDI, Hirsch and Lockwood)

62. All preceding allegations are realleged herein.

**16**

63.   Plaintiff asserts that:

(a)   The misrepresentations of material fact made by the Buyers in writing to CTI were made intentionally or recklessly, with scienter and designed to take advantage of Regulation S to which Buyers were not entitled.

(b)   Plaintiff relied upon the misrepresentations to its detriment.

(c)   The misstatements were made in connection with the purchase and sale of securities and in violation of section 10(b) and rule 10 B-5 of the Exchange Act.

64.   Plaintiff has been damaged in an amount in excess of $75,000.00

65.   Plaintiff is entitled to damages against RSILL, BANCOOP, MARDI, Hirsch, and Lockwood.

## COUNT V

### (Claim against Select, Pegasus, Lopez, and Goldstein for violation of Section 15 (c)(1) of the 1934 Exchange Act)

66.   The preceding allegations are realleged herein.

67.   Defendants, Select, Ron Williams, Pegasus, Lopez and Goldstein alone or in conjunction with others have violated section 15(c)(1) of the 1934 Securities Exchange Act by engaging in manipulation, and deceptive activities as has been alleged above and by operating as unlicensed broker/dealers and receiving unlawful commissions in connection with the sale of Plaintiff's securities.

68.   Plaintiff has been damaged in excess of $75,000.00.

**17**

## COUNT VI
### (Claim for common law fraud against Select and Ron Williams)

70.  Plaintiff realleges all general allegations herein.

71.  This is an action for common law fraud, alleged here pursuant to the doctrine of pendent jurisdiction.

72.  Select and Ron Williams repeatedly represented that they were able to raise significant investment capital for CTI. Additionally, Select and Williams conspicuously failed to notify CTI that Williams has been under indictment for fraud and investigation in connection with raising of investment capital. Select and Williams failed to reveal the true nature and origin of the Buyers of CTI's investment capital.  Select and Williams purposely substituted material terms with respect to the investment securities CTI was issuing, brokered by Select and Williams, deceiving CTI into believing it was executing an agreement with terms different from that was presented.

73.  At the time Select and Williams made the aforementioned representations, Select and Williams knew such representations were false.

74.     Select   and   Williams   made   the   aforementioned representations for the purpose of inducing CTI to act in reliance therewith, including, but not limited to, paying a non-refundable $10,000.00 fee to Select and Williams and entering into a subscription agreement.

75.  CTI relied to its detriment on the representations made by both Select and Williams.

76.  CTI's reliance on Select and William's representations

**18**

has caused CTI significant damage, including, but not limited, hampering its ability to raise investment capital from legitimate sources and the corporations further expansion.

77.   CTI has been damaged is excess of $75,000.00.

## COUNT VII

### (Claim for negligent misrepresentation against Select and Williams)

78.   The preceding allegations are realleged herein.

79.   This is an action for negligent misrepresentation, alleged here pursuant to the doctrine of pendent jurisdiction..

80. Select and Williams repeatedly represented that they were able to raise significant investment capital for CTI. Additionally, Select and Williams conspicuously failed to notify CTI that Williams has been under indictment for fraud in connection with raising of investment capital. Select and Williams failed to reveal the true nature and origin of the Buyers of CTI's investment capital. Select and Williams purposely substituted material terms with respect to the investment securities CTI was issuing, brokered by Select and Williams, deceiving CTI into believing it was executing an agreement with terms different from that was presented.

81.   Select and Williams knew at the time of making the aforementioned representations as to the falsity of such representations or made such representation under such circumstances under which Select and/or Williams should known the falsity of such representations.

19

82.   Select and Williams intended their representations to induce CTI to act upon said representations.

83.   CTI reasonably relied on Select and Williams representations.

84.   As a direct and proximate result of Select and Williams misrepresentations, CTI has been significantly injured.

## COUNT VIII

## (Claim action for violation of sections 517.211 and 517.301, Florida statutes against all defendants)

85.   The preceding allegations are realleged herein.

86.   This is an action for violations of sections 517.211 and 571.301, Florida Statutes, alleged here pursuant to the doctrine of pendent jurisdiction..

87.   Select and Williams repeatedly represented that they were able to raise significant investment capital for CTI. Additionally, Select and Williams conspicuously failed to notify CTI that Williams has been under indictment for fraud in connection with raising of investment capital. Select and Williams failed to reveal the true nature and origin of the Buyers of CTI's investment capital. Select and Williams purposely substituted material terms with respect to the investment securities CTI was issuing, brokered by Select and Williams, deceiving CTI into believing it was executing an agreement with terms different from that was presented.

20

88.    Select   and   Williams   made   the   aforementioned
representations for the purpose of inducing CTI to act in reliance
therewith, including, but not limited to, paying a non-refundable
$10,000.00  fee  to  Select  and  Williams  and  entering  into  a
subscription agreement.

89.   CTI relied to its detriment on the representations made
by both Select and Williams.

90. CTI's reliance on Select and William's representations has
caused  CTI  significant  damage,  including,  but  not  limited,
hampering its ability to raise investment capital from legitimate
sources and the corporations further expansion.

91.   The Buyers intentionally misrepresented material facts
which such artifice was designed to take advantage of Regulation S,
to which the Buyers were not entitled to use.

92.   At the time the Defendants made the aforementioned
representations, they knew such representations were false or
Defendants were negligent in not ascertaining the truth or falsity
of their representations.

93.   The Defendants and Plaintiff were in "buyer/seller"
privity  as  Plaintiff,  CTI,  sold  investment  securities  to
Defendants.

94.    As  a  direct  and  proximate  result  of  Defendants'
violations of sections 517.211 and 517.301, Fla. Stats., Plaintiff,
CTI, has been damaged.

95.   Plaintiff, CTI, has requested, in writing that the
aforementioned securities be returned to CTI in exchange for the

21

purchase price paid by Defendants, plus interest at the legal rate, less any and all income received by Defendants on the security.

96. Plaintiff, CTI, has retained the services of undersigned law firm and agreed to pay same a reasonable attorneys' fee.

## COUNT IX
## (Claim for cancellation recission and reformation)

97. The preceding allegations are realleged herein.

98. CTI has no adequate remedy at law.

99. Either by mutual mistake or by misrepresentation, the issued debentures do not reflect the agreement of both CTI and the Buyers and are not consistent with applicable federal law.

100. CTI requests this Court to order cancellation and recission of the debentures upon such grounds as are proper and just.

101. In the alternative, CTI demands reformation of the debentures to conform with the intent of CTI and to conform with federal law.


## DAMAGES AS TO ALL COUNTS

102. All preceding allegations are realleged herein.

103. Plaintiff CTI demands Judgment for damages against all defendants in an amount which exceeds $75,000.00 exclusive of interest and costs.

104. Plaintiff demands recission of the debentures as to the Buyers.

105. Plaintiff demands attorney's fees and costs pursuant to law.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by Jury on all issues so triable.

SPENCER & KLEIN, P.A.
Attorneys for CTI
801 Brickell Avenue
Suite #1901
Miami, Florida  33131
(305) 374-7700
(305) 374-4890 (Fax)

By:

Thomas R. Spencer, Jr.
Fla. Bar No. 121143
Member, Trial Bar, USDC (SD Fla.)

Dated: December 9, 1997

23



**Select Capital Advisors, Inc.**
An International Financial Services Holding Company

1221 Brickell Avenue - Suite 1600
Miami, Florida 33131
Telephone 305 536-2300
Facsimile 305 536-2920

March 9, 1997

**VIA FACSIMILE**
TEL. (503) 650-8551

Dave Johnston
Computerized Thermal Imaging, Inc.

Dear Mr. Johnston:

Please let this letter stand as a commitment by Select Capital Advisors, Inc., a Florida

corporation ("Select") to arrange for the capitalization of Computerized Thermal Imaging,

Inc. (the "Corporation"). For ten dollars and other good and valuable consideration it is

agreed as follows:

(1)     Select shall arrange for an equity private placement for up to six million dollars

        (USD $6,000,000.00), within thirty (30) days after the completion of the due

        diligence period, through an institutional equity placement. Terms and conditions

        of such placement shall be subject to the approval of the Corporation. It is our

        intention to raise enough capital that the Corporation can logically spend during the

        first twelve month period of this Agreement that can not be debt financed. The

        exact amount shall be determined in the due diligence period described below.

        Select shall act as an investment banker on behalf of the Corporation, and shall not

        be an underwriter of the securities issued by the Corporation.

# EXHIBIT "A"

FROM COOPER, REED, MARK & McGRAW                    (TUE) 4. 22' 97 16:29/ST. 16:28/NO. 3760473967 P  3

(2)    Select shall arrange to structure a secured bond placement to net the Corporation

a total amount of twenty-five million dollars (USD $25,000,000.00).  This placement

would fund within forty-five (45) days after the completion of the due diligence

period described above and be the first traunche of an up to $200,000,000

proposed secured bond financing, subject to a successful placement of the first

offering.  The exact terms and conditions of this bond placement will be subject to

your approval, but we would contemplate the form of the investment will be

convertible securities.


(3)    Select shall arrange a bridge loan for the Corporation for up to two million dollars

(USD $2,000,000.00).  The bridge loan shall be secured against the purchase

orders, inventory, account receivable and equipment of the Corporation, upon terms

and conditions acceptable to the Corporation.  This bridge loan shall fund at the

end of the due diligence period and shall be repaid from either the equity funding

described in paragraph 1 above or the bond financing described in paragraph 2

above.


(4)    At the request of the Corporation, Select shall arrange senior debt for the

Corporation.  This debt placement will be upon terms and conditions acceptable to

the Corporation.  Such financing shall be secured by the assets of the Corporation.


(5)    At the appropriate time, Select shall arrange for the Corporation's common stock

to be traded on NASDAQ.  Select shall also arrange a firm underwriting commitment

for a placement of equity in an amount to be determined upon terms and conditions acceptable to the Corporation.

(6)   Upon listing on NASDAQ, Select shall seek to introduce you to potential market makers and financial public relations firms in order to improve the liquidity of the stock and to increase shareholders value.  The exact terms and conditions of such relationship shall be subject to approval of the Corporation.

(7)   Select shall arrange for the following:

    (A)   Completion of a business profile, corporate business overview and an underwriters due diligence book and underwriters proposal (the "Funding Package").

    (B)   Completion of negotiations on behalf of the Corporation with the financial institutions.

    (C)   Location and funding of equity and debt described in this Agreement, which shall include the negotiation of the terms of such financing and overseeing the documentation of such financing;

    (D)   Coordination of all professionals in order to complete all financings contemplated by this Agreement.

    (E)   Coordination of all aspects of the financing in order to assure funding within the committed time frames; and

    (F)   Consultation with the officers and Board of Directors of the Corporation concerning the negotiation of all terms of the funding described herein, the

restructuring of the balance sheet of the Corporation, if needed, and the proper incentive compensation programs for officers and directors of the Corporation.

(8)    Select will seek strategic alliances for the Corporation in international markets as well as assisting in the financing of those markets. In the near term, Select will introduce the Corporation to the international financial markets to increase the stock's liquidity and enhance shareholder values.

(9)    The Corporation and Select shall immediately begin to compile the necessary information in order to complete a Funding Package. Such information shall include but not be limited to.

(A)    An audited balance sheet and audited operating income and expense statements for the last 2 fiscal years of the Corporation or the life of the Corporation, whichever is less;

(B)    An unaudited balance sheet dated within 30 days;

(C)    A complete history of the Corporation, including resumes of the principal officers, directors and employees of the Corporation;

(D)    Financial projections for the next 5 fiscal years of the Corporation;

(E)    Business plan showing the desired business results over the next 5 years for the Corporation;

(F)    Bank, business, legal and accounting references;

(G)    A lists of the Corporation's competitors and the competitive position of other companies in the Corporation's industry;

(H)    Projected uses of the capitalization to be provided; and

(I)    Business strategies to accomplish the stated business objectives of the Corporation.

One copy of all the above described material shall be sent to Select's office in Miami at 1221 Brickell Avenue, Suite 1010, Miami, Florida 33131 and another copy sent to its due diligence office in Dallas at 5525 North MacArthur Blvd, Suite 550, Irving, Texas 75038.

(10)    It is contemplated that the Funding Package shall be completed within 45 days from this date. During such 45 day period, Select shall conduct a review (the "Review") of the operations and management of the Corporation to satisfy itself that Select can fulfill its commitments made hereunder. Select shall commit its employees to the Corporation in order to accomplish the completion of the Funding Package and the Review within this time period. Notwithstanding the foregoing, the Corporation shall have the principal responsibility for gathering the information required for the Funding Package and the Review. Should the information not be forthcoming to Select by the Corporation within a reasonable time period as established by Select, then the time period described in this letter shall be extended by the time taken by the Corporation to gather the information. The Review shall be completed and the

Case 1:97-cv-03960-LCN Document 1 Entered on FLSD Docket 12/10/1997 Page 29 of 53

Funding Package completed when the Corporation has executed a due diligence release letter to Select.

(11)  Upon completion of the Funding Package, Select shall write and issue to the appropriate metropolitan, business, trade and financial wire services, a quarterly Press Release announcing the Corporation's recent business developments and future plans. The Corporation will have final authorization on any information released to the press, and agrees to bear the cost of the wire service fees associated with each quarterly release, not to exceed $500 per release. Copies of Press Releases and articles written shall be utilized in the Corporation's completed Funding Package.

(12)  The Corporation agrees to pay to Select a non-refundable US $10,000.00 as a due diligence fee for the services provided in completing the Funding Package, which shall be payable at the time of the execution of this Agreement. There shall be no other fees due to Select prior to the closing of the financings, and Select shall bear all legal, accounting and travel expenses associated with performing its services hereunder.

(13)  Upon closing of the offering described in paragraphs 1 and 2 of this Agreement. Select shall be entitled to receive a fee equal to ten percent (10%) of equity raised by the Corporation.

Upon the funding of the equity and/or debt in a minimum amount of $6,000,000(USD), Select shall receive, options to purchase 5% of the Corporation's common stock at book value at the time Select's commitment letter is executed. The options shall be valid for five years from the date of issuance.

(14)    Select shall charge a fee of five percent (5%) of any bridge financing received by the Corporation pursuant to the provisions in paragraph 3 of this letter.

(15)    Select shall charge a fee of two percent (2%) of the gross proceeds received by the Corporation from the firm underwriting described in paragraph 5 of this letter. Such fees shall be paid at the time of the closing of this underwriting.

(16)    Select shall also assist in the arrangement of debt as described in paragraph 4 of this Agreement. Select shall charge a 3% of all debt financing, which shall be payable at the time of debt financing is closed and funded.

(17)    All fees, except the initial non-refundable due diligence fee, shall be paid to Select from the closing of the financing described herein. The Corporation hereby authorizes any funding entity, lender, underwriter and closing attorney to fund these fees directly to Select from the closing proceeds.

(18)    Upon funding, the Corporation agrees that Select shall arrange to place a

tombstone in the U S National edition of the Wall Street Journal indicating that funding has been successfully completed and that the transaction was arranged by Select Capital Advisors.   The cost of such tombstone shall be approximately $10,000 which shall be withheld at the closing.

(19)' Select agrees to indemnify and hold harmless the Corporation and its officers, directors, agents and employees to the full extent lawful, from and against any losses, claims, damages or liabilities relating to or arising out of the activities of Select in connection with this Agreement, including, but not limited to, any losses, claims, damages or liabilities relating to or arising out of any misrepresentation of a material fact made by Select (including omissions to disclose facts known to Select which would have been necessary to make any disclosed facts not misleading) in any information provided to potential investors, and to reimburse the party entitled to be indemnified hereunder for all reasonable expenses (including counsel fees) as may be incurred by such party in connection with investigating, preparing or defending any action or claim, whether or not in connection with pending or threatened litigation or administrative proceedings.

The Corporation agrees to indemnify and hold harmless Select and its officers, directors, agents and employees to the full extent lawful, from and against any losses, claims, damages or liabilities relating to or arising out of the activities of the Corporation in connection with this Agreement, including, but not limited to, any losses, claims, damages or liabilities relating to or arising out of any

misrepresentation of a material fact made by the Corporation (including omissions to disclose facts known to the Corporation which would have been necessary to make any disclosed facts not misleading)in any information provided to potential investors, and to reimburse the party entitled to be indemnified hereunder for all reasonable expenses (including counsel fees) as may be incurred by such party in connection with investigating, preparing or defending any action or claim, whether or not in connection with pending or threatened litigation or administrative proceedings.

Neither Select nor the Corporation will be responsible for any claims, liabilities, losses, damages or expenses which are finally judicially determined to have resulted primarily from the gross negligence or willful misconduct of the other party.

(20)   Each party has agreed to the following representations and warranties:

    (A)   The parties hereto agree that any and all information revealed or divulged by any of the parties hereto, to any other party hereto, is privileged and confidential information which may not be used or communicated by the receiving party without the prior written consent of the communicating party.

    (B)   Each and everyone of the parties agree that they will not circumvent any of the parties to this Agreement. This protection shall continue during any extensions, additions, parallel agreements, rollovers, and renewals to any transactions consummated or not consummated as a result of the efforts of

FROM LOOPER, REED, MARK & McGRAW          (TUE) 4. 22' 97 16:31/ST. 16:28/NO. 3760473967 P 11

any of the parties hereto: specifically, the potential funding sources introduced to the Corporation by Select are recognized as confidential property of Select. Should the Corporation consummate a transaction with these funding sources within one (1) year from the date of this letter, the Corporation agrees to compensate Select in the amount described herein. Select agrees that the Corporation be allowed to continue dealing with any funding sources that they have already developed, which were not developed by Select.

(C)   Information, not previously known by the receiving party, relating to, and the identification of, clients and/or potential client and/or names of individual lending officers of the potential financiers and/or financial institutions are to be considered stock in trade of the revealing or disclosing party. The receiving party shall notify the disclosing party of any such previously known individuals within five (5) business days of such disclosure together with evidence of such prior knowledge; and

(D)   Disclosure of any information, to include technological and intellectual property, protected hereunder, whether through negligence of inadvertent disclosure, is nevertheless a violation and shall constitute a breach of this Agreement. This shall apply whether a commitment or a transaction takes place or not.

(21)   This Agreement between Select Capital Advisors, Inc. and the Corporation shall be exclusive for a period of forty-five days after the completion of due diligence. Select

shall be compensated for any financing resulting from its introductions made to the Company regardless of whether or not the financing concludes within forty-five days. Furthermore, it is agreed that should the Company arrange during the period of exclusivity, through its own sources, debt or equity financing, that Select shall be compensated by one-half of the fees stated in the applicable paragraphs of this Agreement. If any portion of the funds comes in within forty-five days, the period of exclusivity isshall be automatically extended.

(22)    Notwithstanding the foregoing, it is understood that Select shall function on behalf of the Corporation solely as an investment banker, business consultant and public relations company. It shall not underwrite, directly or indirectly, the securities of the Corporation.

(23)    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. The execution of this Agreement may be by actual or facsimile signature.

(24)    In the event of any material dispute between the parties, both parties hereby agree to submit the dispute for Binding Arbitration in the State of Florida.

Case 1:97-cv-03960-LCN   Document 1   Entered on FLSD Docket 12/10/1997   Page 35 of 53

If this Agreement meets with your approval, please indicate in the space provided below.

This Offer is only valid for ten business days, thereafter this Agreement is null and void.

Sincerely,

Ronald G. Williams
Chairman
SELECT CAPITAL ADVISORS, INC

AGREED AND ACCEPTED

This 7th day of Mar, 1997

COMPUTERIZED THERMAL IMAGING, INC.

By: _____
      DAVE JOHNSTON



**Select Capital Advisors, Inc.**
*A Division of a Financial Services Holding Company*

1255 Brickell Avenue - Suite ...
Miami, Florida 33131
Telephone 305-536-2000
Facsimile 305-536-2001

## Term Sheet
## Computerized Thermal Imaging (COII)
### March 28, 1997

| | |
|---|---|
| **Amount:** | Pursuant to the commitment letter dated March 8, 1997, a first traunch of $1,800,000 on principal amount of one year senior secured convertible redeemable high yield debentures which will be sold at 20% below the face amount ($1,500,000). |
| **Type:** | Senior secured convertible redeemable debenture high yield debenture, maturing in one (1) year and convertible 100% in 45 days. |
| **Coupon:** | Twelve percent (12%) per annum on the face (cash or stock) at the company's discretion, payable monthly in advance. The first quarter's interest shall be paid at the time of closing in the form of common stock at 20% below the 5-day average bid at the date of subscription. |
| **Conversion: Price** | At a price equal to 90% of the 5-day average closing bid of the corporations stock immediately preceding the date of conversion. |
| **Lock Up: & Right** | From the date of this term sheet until the closing of the contemplated transaction, Computerized Thermal Imaging, Inc., agrees not to pursue a transaction of the nature already contemplated hereby with any other person unless and until Select has been informed that good faith negotiations have been terminated. Following the closing of the proposed transaction, for ninety (90) days, Computerized Thermal Imaging, Inc., will not, without the written consent of the Select, fund any "Regulation S" financing and/or equity private placement with common stock registration rights. Thereafter, for three hundred and sixty (360) days, the investors will have the right of first refusal in respect of any equity financing on the same terms and conditions as offered by any third party. |

# EXHIBIT "B"

| | |
|---|---|
| Placement:<br>Fee | Select shall receive a fee of 10% plus 2% non-accountable expense of the amount of the placement direct from escrow as each traunch is funded. |
| Warrants: | Select shall receive one hundred fifty thousand dollars ($150,000) of non-dilutive warrants with a strike price of one hundred twenty percent (120%) of the closing bid price on the day of the closing. |
| Closing: | On or before April 10, 1997. |

The parties hereby acknowledge their mutual agreement to the above terms and their intention to negotiate the contemplated transaction in an expedited manner and in good faith. This term sheet represents our current agreement with respect to the subject matter hereof and supersedes any prior agreement or understanding with the respect of such subject matter. If this term sheet is not executed by both parties at the close of business by April 2, 1997, then this term sheet will be considered void. By executing the term sheet Computerized Thermal Imaging, Inc. represents and warrants that it has obtained or within seven (7) calendar days will obtain the necessary. Board of Directors and/or other approvals to cause this term sheet to be duly authorized, executed and delivered by Computerized Thermal Imaging, Inc.

COMPUTERIZED THERMAL IMAGING, INC. AGREES TO KEEP THIS TERM SHEET CONFIDENTIAL AND NOT DISTRIBUTE IT TO OR DISCUSS IT WITH ANY THIRD PARTY WITHOUT THE EXPRESS CONSENT OF SELECT CAPITAL ADVISORS, INC.

Agreed and Accepted by:

Company:_____

Officer:_____ (Title)

Date:_____

Select Capital Advisors, Inc.

Officer: _____, Pres

Date: 3/23/97

# OFFSHORE SECURITIES SUBSCRIPTION AGREEMENT

THIS OFFSHORE SECURITIES SUBSCRIPTION AGREEMENT dated as of April 15, 1997 (the "Agreement"), is executed in reliance upon the exemption from registration afforded by Regulation S ("Regulation S") as promulgated by the Securities and Exchange Commission ("SEC"), under the Securities Act of 1933, as amended. Capitalized terms used herein and not defined shall have the meanings given to them in Regulation S.

This Agreement has been executed by the undersigned "Buyer" in connection with the private placement of 12% Series A Senior Subordinated Convertible Redeemable Debentures of Computerized Thermal Imaging, Inc., a corporation organized under the laws of Nevada, with its principal executive offices located at 6105 Macadam, Portland, OR 97201 (hereinafter referred to as "Seller"). Buyer hereby represents and warrants to, and agrees with Seller:

**THE SECURITIES OFFERED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "1933 ACT"), AND MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES (AS DEFINED IN REGULATION S OF THE 1933 ACT) OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS (AS DEFINED IN REGULATION S OF THE 1933 ACT) EXCEPT PURSUANT TO REGISTRATION UNDER OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE 1933 ACT.**

1.    Agreement To Subscribe; Purchase Price.

    (a)    *Subscription.*   The undersigned Buyer hereby subscribes for and agrees to purchase a portion of the Seller's 12% Series A Senior Subordinated Convertible Redeemable Debentures substantially in the form of the Debentures attached as Exhibit A hereto and having an aggregate original principal face amount of up to U.S. $1,875,000 (singly, a "Debenture," and collectively, the "Debentures"), at an aggregate purchase price of 80% of the face amount of such Debentures as set forth in subsection (b) herein.

    (b)    *Payment.*   The aggregate Purchase Price for the portion of the Debentures purchased by the Buyer shall be Thirty-Five Thousand United States Dollars (U.S. $35,000) which represents a discount of 20% of the face amount of the Debenture purchased by the Buyer (the "Purchase Price"), which shall be payable pursuant to paragraph C herein by delivering immediately available funds in United States Dollars by wire transfer to the designated depository Barry B. Globerman, Esq., as Escrow Agent ("Escrow Agent") for closing by delivery of securities versus payment.

    (c)    *Closing.*   Subject to the satisfaction of the conditions set forth in Sections 7 and 8 hereof, payments of the Purchase Price may be made from time to time in denominations of

EXHIBIT "C"

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date first set forth above.

Official Signatory of Seller:

Computerized Thermal Imaging, Inc.

By: _____

Title: _____  Chairm / CEO

Accepted this 15ᵗʰ day of April, 1997

Official Signatory of Buyer:

By: _____  4/15/97.

By: JORGE A. CIVEO

Title: AUTHORIZED SIGNATORY
FOR MAREI INT'L CORP.

Address of Buyer:

MAREI INTERNATIONAL CORP.
EDIFICIO ONANCO
VIA ESPAÑA   NO. 200  PISO  6 Y 7
PANAMA  5  RDP.

Tel No. _____

$ 35,000⁰⁰  GROSS INVESTMENT

$ 43,250ⁿ  PRINCIPAL PRESENTRAL
FACE AMOUNT.

-11-

MARDI

# DEBENTURE

**THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES (AS DEFINED IN REGULATION S UNDER THE ACT) OR TO, OR FOR THE ACCOUNT OR BENEFIT OF U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE ACT) EXCEPT PURSUANT TO REGISTRATION UNDER THE ACT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND APPLICABLE STATE SECURITIES LAWS.**

US $43,750

No. _____

## COMPUTERIZED THERMAL IMAGING, INC.

### 12% SERIES A SENIOR SUBORDINATED CONVERTIBLE REDEEMABLE DEBENTURE DUE APRIL 30, 1998

THIS DEBENTURE is one of a duly authorized issue of Debentures of Computerized Thermal Imaging, Inc., a corporation duly organized and existing under the laws of Nevada (the "Company") designated as its 12% Series A Senior Subordinated Convertible Redeemable Debentures Due April 30, 1998, in an aggregate principal face amount not exceeding One Million, Eight Hundred Seventy-Five Thousand Dollars (U.S. $1,875,000) which Debentures are being purchased at 80% of the face amount of such Debentures.

FOR VALUE RECEIVED, the Company promises to pay to Mardi International Corp., the registered holder hereof and its successors and assigns (the "Holder"), the principal face sum of Forty-Three Thousand, Seven Hundred Fifty Dollars (US $43,750) on April 30, 1998 (the "Maturity Date"), and to pay interest on the principal sum outstanding, at the rate of 12% per annum due and payable quarterly commencing _____, 1997 pursuant to paragraph 4(b) herein. Accrual of interest shall commence on the date hereof and shall continue until payment in full of the outstanding principal sum has been made or duly provided for. The interest so payable will be paid to the person in whose name this Debenture (or one or more predecessor Debentures) is registered on the records of the Company regarding registration and transfers of the Debentures (the "Debenture Register"); provided, however, that the Company's obligation to a transferee of this Debenture arises only if such transfer, sale or other disposition is made in accordance with the terms and conditions of the Offshore Securities Subscription Agreement dated as of April 15, 1997 between the Company and Mardi International Corp. (the "Subscription Agreement"). The principal of, and interest (with the exception of the prepaid interest set forth in Section 4(b) herein) on, this Debenture are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts, at the address last appearing on the Debenture Register of the Company as designated in writing by the Holder hereof from time to time. The Company will pay the outstanding principal due upon this Debenture before or on the Maturity Date, less any amounts required by law to be deducted or withheld, to the Holder of this Debenture no later than the tenth (10th) day prior to the Maturity Date by check or on the Maturity Date by wire transfer and addressed to such Holder at the last address appearing on the Debenture Register. The forwarding of such check or wire transfer shall

constitute a payment of outstanding principal hereunder and shall satisfy and discharge the liability for principal on this Debenture to the extent of the sum represented by such check or wire transfer plus any amounts so deducted.  Interest shall be payable in Common Stock (as defined below) pursuant to paragraph 4(b) herein.

This Debenture is subject to the following additional provisions:

1.      The Debentures are issuable in denominations of Ten Thousand Dollars (US$10,000) and integral multiples thereof.  The Debentures are exchangeable for an equal aggregate principal amount of Debentures of different authorized denominations, as requested by the Holders surrendering the same but not less than U.S. $10,000.  No service charge will be made for such registration or transfer or exchange, except that transferee shall pay any tax or other governmental charges payable in connection therewith.

2.      The Company shall be entitled to withhold from all payments of principal of, and interest on, this Debenture any amounts required to be withheld under the applicable provisions of the United States income tax or other applicable laws at the time of such payments.

3.      This Debenture has been issued subject to investment representations of the original purchaser hereof and may be transferred or exchanged in the U.S. only in compliance with the Securities Act of 1933, as amended (the "Act") and applicable state securities laws. Prior to due presentment for transfer of this Debenture, the Company and any agent of the Company may treat the person in whose name this Debenture is duly registered on the Company's Debenture Register as the owner hereof for the purpose of receiving payment as herein provided and for all other purposes, whether or not this Debenture be overdue, and neither the Company nor any such agent shall be affected or bound by notice to the contrary.  Any holder of this Debenture, electing to exercise the right of conversion set forth in Section 4(a) hereof, in addition to the requirements set forth in Section 4(a), and any prospective transferee of this Debenture, is also required to give the Company (i) written confirmation that it is not a U.S. Person and the Debenture is not being converted on behalf of a U.S. Person ("Notice of Conversion") or (ii) an opinion of U.S. counsel to the effect that the Debenture and shares of common stock issuable upon conversion or transfer thereof have been registered under the 1933 Act or are exempt from such registration.  In the event a Notice of Conversion or opinion of counsel is not provided the Holder hereof will not be entitled to exercise the right to convert or transfer the Debentures.

4.      (a)     The Holder of this Debenture is entitled, at its option, at any time commencing 60 days after closing of the Offering hereof to convert up to 1/3 of the original face amount of this Debenture and after 90 days to convert up to 2/3 of the original face amount of this Debenture and after 105 days to convert all or any amount of the principal face amount of this Debenture then outstanding into shares of common stock, $0.001 par value per share, of the Company (the "Common Stock"), at a conversion price for each share of Common Stock equal to the lower of (a) 90% of the average closing bid price of the Common Stock for the five (5) business days immediately preceding the date of receipt by the Company of notice of conversion ("Conversion Shares") or (b) 90% of the one closing bid price of the Common Stock day immediately preceding the date of subscription by the Holder as reported by the National

-2-

Association of Securities Dealers Electronic Bulletin Board ("NASDAQ") (the "Conversion Price"). If the number of resultant Conversion Shares would as a matter of law or pursuant to regulatory authority require the Company to seek shareholder approval of such issuance, the Company shall, as soon as practicable, take the necessary steps to seek such approval. If such approval is not received within 30 days then Company shall be required to redeem the Debenture pursuant to paragraph 4(c) herein. Such conversion shall be effectuated by surrendering the Debentures to be converted (with a copy, by facsimile or courier, to the Company) to the Company with the form of conversion notice attached hereto as Exhibit I, executed by the Holder of this Debenture evidencing such Holder's intention to convert this Debenture or a specified portion (as above provided) hereof, and accompanied by proper assignment hereof in blank. Accrued but unpaid interest shall be subject to conversion. No fractional shares or scrip representing fractions of shares will be issued on conversion, but the number of shares issuable shall be rounded to the nearest whole share. The transferee or issuee shall execute such investment representations or other documents as are respectively required by counsel in order to ascertain the available registration exemption. The date on which notice of conversion is given shall be deemed to be the date on which the Holder has delivered this Debenture, with the assignment and conversion notice duly executed, to the Company or, if earlier, the date set forth in such notice of conversion if the Debenture is received by the Company within five (5) business days thereafter. The transferee or issuee shall execute such investment representations or other documents as are reasonably required by counsel in order to ascertain the available registration exemption.

(b)    Interest at the rate of 12% per annum shall be payable in advance, monthly commencing _____ __, 1997. However, at Closing, the Company shall prepay the first 3 months interest by issuing in Common Stock of the Company as follows: Based on the closing bid prices of the Common Stock for the last 5 consecutive trading days prior to Closing ("Market Price") the Company shall issue to the Holder shares of Common Stock in an amount equal to the total monthly interest accrued and due divided by 80% of the Market Price (the "Interest Shares"). Common Stock issued pursuant hereto shall be issued pursuant to Regulation S in accordance with the terms of the Subscription Agreement. Thereafter, commencing 91 days after Closing the Company shall pay interest on a monthly basis in cash (or Common Stock, based on the above formula, at the Company's option).

(c)    At any time within 90 days the Company shall have the option to pay to the Holder 110% of the principal amount of the Debenture, in full, to the extent conversion has not occurred pursuant to paragraph 4(a) herein, or pay upon maturity if the Debenture is not converted. The Company shall give the Holder 5 days written notice and the Holder during such 5 days shall have the option to convert the Debenture or any part thereof into shares of Common Stock at a conversion price equal to 90% of the average of the closing bid price of the Common Stock for the 5 consecutive trading days prior to the date of such conversion or accept the cash repayment. Any shares issued pursuant to the options shall be issued pursuant to Regulation S or a Registration Statement.

5.    No provision of this Debenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of, and interest on, this Debenture at the time, place, and rate, and in the coin currency, herein prescribed.

-3-

6.    The Company hereby expressly waives demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of acceleration or intent to accelerate, bringing of suit and diligence in taking any action to collect amounts called for hereunder and shall be directly and primarily liable for the payment of all sums owing and to be owing hereon, regardless of and without any notice, diligence, act or omission as or with respect to the collection of any amount called for hereunder.

7.    The Company agrees to pay all costs and expenses, including reasonable attorneys' fees, which may be incurred by the Holder in collecting any amount due under this Debenture.

8.    If one or more of the following described "Events of Default" shall occur and continue for 30 days unless a different time frame is noted below:

(a)    The Company shall default in the payment of principal or interest on this Debenture; or

(b)    Any of the representations or warranties made by the Company herein, in the Subscription Agreement, or in any certificate or financial or other written statements heretofore or hereafter furnished by or on behalf of the Company in connection with the execution and delivery of this Debenture or the Subscription Agreement shall be false or misleading in any material respect at the time made; or

(c)    The Company shall fail to perform or observe, in any material respect, any other covenant, term, provision, condition, agreement or obligation of the Company under this Debenture [and such failure shall continue uncured for a period of thirty (30) days after notice from the Holder of such failure]; or

(d)    The Company shall (1) become insolvent; (2) admit in writing its liability to pay its debts generally as they mature; (3) make an assignment for the benefit of creditors or commence proceedings for its dissolution; or (4) apply for or consent to the appointment of a trustee, liquidator or receiver for its or for a substantial part of its property or business; or

(e)    A trustee, liquidator or receiver shall be appointed for the Company or for a substantial part of its property or business without its consent and shall not be discharged within thirty (30) days after such appointment; or

(f)    Any governmental agency or any court of competent jurisdiction at the instance of any governmental agency shall assume custody or control of the whole or any substantial portion of the properties or assets of the Company and shall not be dismissed within thirty (30) days thereafter; or

(g)    Any money judgment, writ or warrant of attachment, or similar process, in excess of One Hundred Thousand ($100,000) Dollars in the aggregate shall

-4-

be entered or filed against the Company or any of its properties or other assets and shall remain unpaid, unvacated, unbonded or unstayed for a period of fifteen (15) days or in any event later than five (5) days prior to the date of any proposed sale thereunder; or

(h)   Bankruptcy, reorganization, insolvency or liquidation proceedings or other proceedings for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Company and, if instituted against the Company, shall not be dismissed within thirty (30) days after such instruction of the Company shall by any action or answer approve of, consent to, or acquiesce in any such proceedings or admit the material allegations of, or default in answering a petition filed in any such proceeding; or

(i)   The Company shall have its Common Stock delisted from the over-the-counter market.

(j)   Subject to the provisions of Section 5(b) of the Offshore Securities Subscription Agreement and applicable federal and state securities laws, the Company shall not deliver the Common Stock pursuant to paragraph 4 herein without restrictive legend.

Then, or at any time thereafter, and in each and every such case, unless such Event of Default shall have been waived in writing by the Holder (which waiver shall not be deemed to be a waiver of any subsequent default) at the option of the Holder and in the Holder's sole discretion, the Holder may consider this Debenture immediately due and payable, without presentment, demand, protest or (further) notice of any kind (other than notice of acceleration), all of which are hereby expressly waived, anything herein or in any note or other instruments contained to the contrary notwithstanding, and the Holder may immediately, and without expiration of any period of grace, enforce any and all of the Holder's rights and remedies provided herein or any other rights or remedies afforded by law.

9.   (a)   This Debenture represents a secured obligation of the Company pursuant to paragraph 9 herein. However, no recourse shall be had for the payment of the principal of, or the interest on, this Debenture, or for any claim based hereon, or otherwise in respect hereof, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or any successor corporation, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise, all such liability being, by the acceptance hereof and as part of the consideration for the issue hereof, expressly waived and released.

(b)   Company shall contemporaneously with the issuance of this Debenture grant the Holder a lien against the Company's assets having a value of not less than U.S. $2,250,000 as detailed on Exhibit B hereto.

-5-

10.    The Holder of this Debenture, by acceptance hereof, agrees that this Debenture is being acquired for investment and that such Holder will not offer, sell or otherwise dispose of this Debenture or the Shares of Common Stock issuable upon exercise thereof except under circumstances which will not result in a violation of the Act or any applicable state Blue Sky law or similar laws relating to the sale of securities.

11.    In case any provision of this Debenture is held by a court of competent jurisdiction to be excessive in scope or otherwise invalid or unenforceable, such provision shall be adjusted rather than voided, if possible, so that it is enforceable to the maximum extent possible, and the validity and enforceability of the remaining provisions of this Debenture will not in any way be affected or impaired thereby.

12.    This Debenture and the agreements referred to in this Debenture constitute the full and entire understanding and agreement between the Company and the Holder with respect to the subject hereof. Neither this Debenture nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument signed by the Company and the Holder.

13.    This Debenture shall be governed by and construed in accordance with the laws of New York. Holder hereby waives trial by jury and consents to exclusive jurisdiction and venue in the State of New York.

14.    As set forth herein, the Company shall use all reasonable efforts to issue and deliver, within three business days after the Holder has fulfilled all conditions and submitted all necessary documents duly executed and in proper form required for conversion (the "Deadline"), to the Holder or any part receiving a Debenture by transfer from the Holder (together, a "Holder"), at the address of the Holder on the books of the Company, a certificate or certificates for the number of Shares of Common Stock to which the Holder shall be entitled. The Company understands that a delay in the issuance of the Shares of Common Stock beyond the Deadline could result in economic loss to the Holder. As compensation to the Holder for such loss, the Company agrees to pay liquidated damages to the Holder for late issuance of Shares upon conversion in accordance with the following schedule (where "No. Business Days Late" is defined as the number of business days beyond seven (7) business days from the date of receipt by the Company of a Notice of Conversion and the transfer agent of all necessary documentation duly executed and in proper form required for conversion, including the original Debenture to be converted, all in accordance with the Debenture, Subscription Agreement and the requirements of the transfer agent):

| No. Business Days Late | Liquidated Damages per $100,000 of Debenture |
|---|---|
| 1 | $500 |
| 2 | $1,000 |
| 3 | $1,500 |
| 4 | $2,000 |
| 5 | $2,500 |
| 6 | $3,000 |

-6-

|    |                                            |
|----|--------------------------------------------|
| 7  | $3,500                                     |
| 8  | $4,000                                     |
| 9  | $4,500                                     |
| 10 | $5,000                                     |
| 10 | $5,000 + $1,000 each                        |
|    | Business Day Late beyond 10 days           |

The Company shall pay the Holder any liquidated damages incurred under this Section by check upon the earlier to occur of (i) issuance of the Shares to the Holder or (ii) each monthly anniversary of the receipt of the Company of such Holder's Notice of Conversion. Nothing herein shall limit the Holder's right to pursue actual damages for the Company's failure to issue and deliver shares of Common Stock to the Subscriber in accordance with the terms of the Debenture.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed by an officer thereunto duly authorized.

Dated: _____April 23, 97_____

COMPUTERIZED THERMAL IMAGING, INC.

By: _____

Title: _____CEO_____

-7-

# DEBENTURE

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES (AS DEFINED IN REGULATION S UNDER THE ACT) OR TO, OR FOR THE ACCOUNT OR BENEFIT OF U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE ACT) EXCEPT PURSUANT TO REGISTRATION UNDER THE ACT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND APPLICABLE STATE SECURITIES LAWS.

No. _____                                                  US $_____

## COMPUTERIZED THERMAL IMAGING, INC.

## 12% SERIES A SENIOR SUBORDINATED CONVERTIBLE REDEEMABLE DEBENTURE DUE APRIL 30, 1998

THIS DEBENTURE is one of a duly authorized issue of Debentures of Computerized Thermal Imaging, Inc., a corporation duly organized and existing under the laws of_____ (the "Company") designated as its 12% Series A Senior Subordinated Convertible Redeemable Debentures Due April 30, 1998, in an aggregate principal face amount not exceeding One Million, Eight Hundred Seventy-Five Thousand Dollars (U.S. $1,875,000) which Debentures are being purchased at 80% of the face amount of such Debentures.

FOR VALUE RECEIVED, the Company promises to pay to _____ _____ the registered holder hereof and its successors and assigns (the "Holder"), the principal face sum of_____ Dollars (US $_____) on April 30, 1998 (the "Maturity Date"), and to pay interest on the principal sum outstanding, at the rate of 12% per annum due and payable quarterly commencing _____, 1997 pursuant to paragraph 4(b) herein. Accrual of interest shall commence on the date hereof and shall continue until payment in full of the outstanding principal sum has been made or duly provided for. The interest so payable will be paid to the person in whose name this Debenture (or one or more predecessor Debentures) is registered on the records of the Company regarding registration and transfers of the Debentures (the "Debenture Register"); provided, however, that the Company's obligation to a transferee of this Debenture arises only if such transfer, sale or other disposition is made in accordance with the terms and conditions of the Offshore Securities Subscription Agreement dated as of _____ between the Company and _____ _____ (the "Subscription Agreement"). The principal of, and interest (with the exception of the prepaid interest set forth in Section 4(b) herein) on, this Debenture are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts, at the address last appearing on the Debenture Register of the Company as designated in writing by the Holder hereof from time to time. The Company will pay the outstanding principal due upon this Debenture before or on the Maturity Date, less any amounts required by law to be deducted or withheld, to the Holder of this Debenture no later than the tenth (10th) day prior to the Maturity Date by check or on the Maturity Date by wire transfer and addressed to such Holder at the last address appearing on the Debenture Register. The forwarding

of such check or wire transfer shall constitute a payment of outstanding principal hereunder and shall satisfy and discharge the liability for principal on this Debenture to the extent of the sum represented by such check or wire transfer plus any amounts so deducted. Interest shall be payable in Common Stock (as defined below) pursuant to paragraph 4(b) herein.

This Debenture is subject to the following additional provisions:

1.     The Debentures are issuable in denominations of Ten Thousand Dollars (US$10,000) and integral multiples thereof. The Debentures are exchangeable for an equal aggregate principal amount of Debentures of different authorized denominations, as requested by the Holders surrendering the same but not less than U.S. $10,000. No service charge will be made for such registration or transfer or exchange, except that transferee shall pay any tax or other governmental charges payable in connection therewith.

2.     The Company shall be entitled to withhold from all payments of principal of, and interest on, this Debenture any amounts required to be withheld under the applicable provisions of the United States income tax or other applicable laws at the time of such payments.

3.     This Debenture has been issued subject to investment representations of the original purchaser hereof and may be transferred or exchanged in the U.S. only in compliance with the Securities Act of 1933, as amended (the "Act") and applicable state securities laws. Prior to due presentment for transfer of this Debenture, the Company and any agent of the Company may treat the person in whose name this Debenture is duly registered on the Company's Debenture Register as the owner hereof for the purpose of receiving payment as herein provided and for all other purposes, whether or not this Debenture be overdue, and neither the Company nor any such agent shall be affected or bound by notice to the contrary. Any holder of this Debenture, electing to exercise the right of conversion set forth in Section 4(a) hereof, in addition to the requirements set forth in Section 4(a), and any prospective transferee of this Debenture, is also required to give the Company (i) written confirmation that it is not a U.S. Person and the Debenture is not being converted on behalf of a U.S. Person ("Notice of Conversion") or (ii) an opinion of U.S. counsel to the effect that the Debenture and shares of common stock issuable upon conversion or transfer thereof have been registered under the 1933 Act or are exempt from such registration. In the event a Notice of Conversion or opinion of counsel is not provided the Holder hereof will not be entitled to exercise the right to convert or transfer the Debentures.

4.     (a)     The Holder of this Debenture is entitled, at its option, at any time commencing 45 days after closing of the Offering hereof to convert all or any amount over $10,000 of the principal face amount of this Debenture then outstanding into shares of common stock, $0.001 par value per share, of the Company (the "Common Stock"), at a conversion price for each share of Common Stock equal to the lower of (a) 90% of the average closing bid price of the Common Stock for the five (5) business days immediately preceding the date of receipt by the Company of notice of conversion ("Conversion Shares") or (b) 90% of the one closing bid price of the Common Stock day immediately preceding the date of subscription by the Holder as reported by the National Association of Securities Dealers Electronic Bulletin Board ("NASDAQ") (the "Conversion Price"). If the number of resultant Conversion Shares would as a

-2-

matter of law or pursuant to regulatory authority require the Company to seek shareholder approval of such issuance, the Company shall, as soon as practicable, take the necessary steps to seek such approval. If such approval is not received within 30 days then Company shall be required to redeem the Debenture pursuant to paragraph 4(c) herein. Such conversion shall be effectuated by surrendering the Debentures to be converted (with a copy, by facsimile or courier, to the Company) to the Company with the form of conversion notice attached hereto as Exhibit I, executed by the Holder of this Debenture evidencing such Holder's intention to convert this Debenture or a specified portion (as above provided) hereof, and accompanied by proper assignment hereof in blank. Accrued but unpaid interest shall be subject to conversion. No fractional shares or scrip representing fractions of shares will be issued on conversion, but the number of shares issuable shall be rounded to the nearest whole share. The transferee or issuee shall execute such investment representations or other documents as are respectively required by counsel in order to ascertain the available registration exemption. The date on which notice of conversion is given shall be deemed to be the date on which the Holder has delivered this Debenture, with the assignment and conversion notice duly executed, to the Company or, if earlier, the date set forth in such notice of conversion if the Debenture is received by the Company within five (5) business days thereafter. The transferee or issuee shall execute such investment representations or other documents as are reasonably required by counsel in order to ascertain the available registration exemption.

              (b)      Interest at the rate of 12% per annum shall be payable in advance, monthly commencing _____ ___, 1997. However, at Closing, the Company shall prepay the first 3 months interest by issuing in Common Stock of the Company as follows: Based on the closing bid prices of the Common Stock for the last 5 consecutive trading days prior to Closing ("Market Price") the Company shall issue to the Holder shares of Common Stock in an amount equal to the total monthly interest accrued and due divided by 80% of the Market Price (the "Interest Shares"). Common Stock issued pursuant hereto shall be issued pursuant to Regulation S in accordance with the terms of the Subscription Agreement. Thereafter, commencing 91 days after Closing the Company shall pay interest on a monthly basis in cash (or Common Stock, based on the above formula, at the Company's option).

              (c)      At any time within 90 days the Company shall have the option to pay to the Holder 110% of the principal amount of the Debenture, in full, to the extent conversion has not occurred pursuant to paragraph 4(a) herein, or pay upon maturity if the Debenture is not converted. The Company shall give the Holder 5 days written notice and the Holder during such 5 days shall have the option to convert the Debenture or any part thereof into shares of Common Stock at a conversion price equal to 90% of the average of the closing bid price of the Common Stock for the 5 consecutive trading days prior to the date of such conversion or accept the cash repayment. Any shares issued pursuant to the options shall be issued pursuant to Regulation S or a Registration Statement.

        5.      No provision of this Debenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of, and interest on, this Debenture at the time, place, and rate, and in the coin currency, herein prescribed.

6.    The Company hereby expressly waives demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of acceleration or intent to accelerate, bringing of suit and diligence in taking any action to collect amounts called for hereunder and shall be directly and primarily liable for the payment of all sums owing and to be owing hereon, regardless of and without any notice, diligence, act or omission as or with respect to the collection of any amount called for hereunder.

7.    The Company agrees to pay all costs and expenses, including reasonable attorneys' fees, which may be incurred by the Holder in collecting any amount due under this Debenture.

8.    If one or more of the following described "Events of Default" shall occur and continue for 30 days unless a different time frame is noted below:

(a)    The Company shall default in the payment of principal or interest on this Debenture; or

(b)    Any of the representations or warranties made by the Company herein, in the Subscription Agreement, or in any certificate or financial or other written statements heretofore or hereafter furnished by or on behalf of the Company in connection with the execution and delivery of this Debenture or the Subscription Agreement shall be false or misleading in any material respect at the time made; or

(c)    The Company shall fail to perform or observe, in any material respect, any other covenant, term, provision, condition, agreement or obligation of the Company under this Debenture [and such failure shall continue uncured for a period of thirty (30) days after notice from the Holder of such failure]; or

(d)    The Company shall (1) become insolvent; (2) admit in writing its liability to pay its debts generally as they mature; (3) make an assignment for the benefit of creditors or commence proceedings for its dissolution; or (4) apply for or consent to the appointment of a trustee, liquidator or receiver for its or for a substantial part of its property or business; or

(e)    A trustee, liquidator or receiver shall be appointed for the Company or for a substantial part of its property or business without its consent and shall not be discharged within thirty (30) days after such appointment; or

(f)    Any governmental agency or any court of competent jurisdiction at the instance of any governmental agency shall assume custody or control of the whole or any substantial portion of the properties or assets of the Company and shall not be dismissed within thirty (30) days thereafter; or

(g)    Any money judgment, writ or warrant of attachment, or similar process, in excess of One Hundred Thousand ($100,000) Dollars in the aggregate shall

-4-

circumstances which will not result in a violation of the Act or any applicable state Blue Sky law or similar laws relating to the sale of securities.

11.    In case any provision of this Debenture is held by a court of competent jurisdiction to be excessive in scope or otherwise invalid or unenforceable, such provision shall be adjusted rather than voided, if possible, so that it is enforceable to the maximum extent possible, and the validity and enforceability of the remaining provisions of this Debenture will not in any way be affected or impaired thereby.

12.    This Debenture and the agreements referred to in this Debenture constitute the full and entire understanding and agreement between the Company and the Holder with respect to the subject hereof.  Neither this Debenture nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument signed by the Company and the Holder.

13.    This Debenture shall be governed by and construed in accordance with the laws of New York.  Holder hereby waives trial by Jury and consents to exclusive jurisdiction and venue in the State of New York.

14.    As set forth herein, the Company shall use all reasonable efforts to issue and deliver, within three business days after the Holder has fulfilled all conditions and submitted all necessary documents duly executed and in proper form required for conversion (the "Deadline"), to the Holder or any part receiving a Debenture by transfer from the Holder (together, a "Holder"), at the address of the Holder on the books of the Company, a certificate or certificates for the number of Shares of Common Stock to which the Holder shall be entitled.  The Company understands that a delay in the issuance of the Shares of Common Stock beyond the Deadline could result in economic loss to the Holder.  As compensation to the Holder for such loss, the Company agrees to pay liquidated damages to the Holder for late issuance of Shares upon conversion in accordance with the following schedule (where "No. Business Days Late" is defined as the number of business days beyond seven (7) business days from the date of receipt by the Company of a Notice of Conversion and the transfer agent of all necessary documentation duly executed and in proper form required for conversion, including the original Debenture to be converted, all in accordance with the Debenture, Subscription Agreement and the requirements of the transfer agent):

| No. Business Days Late | Liquidated Damages per $100,000 of Debenture |
|---|---|
| 1 | $500 |
| 2 | $1,000 |
| 3 | $1,500 |
| 4 | $2,000 |
| 5 | $2,500 |
| 6 | $3,000 |
| 7 | $3,500 |
| 8 | $4,000 |
| 9 | $4,500 |

-6-

# EXHIBIT I

## NOTICE OF CONVERSION

(To be Executed by the Registered Holder in order to Convert the Debenture)

The undersigned hereby irrevocably elects to convert $_____ of the above Debenture No. ___ into Shares of Common Stock of Computerized Thermal Imaging, Inc. (the "Company") according to the conditions set forth in such Debenture, as of the date written below.

The undersigned represents that it is not a U.S. Person as defined in Regulation S promulgated under the Securities Act of 1933, as amended, and is not converting the Debenture on behalf of any U.S. Person and the representations contained in the Subscription Agreement are true. If Shares are to be issued in the name of a person other than the undersigned, the undersigned will pay all transfer taxes payable with respect thereto.

Date of Conversion*_____

Applicable Conversion Price_____

Signature_____
[Print Name of Holder and Title of Signer]

Address:_____

_____

_____
Medallion Signature Guaranty

* This original Debenture and Notice of Conversion must be received by the Company by the fifth business date following the Date of Conversion.

PATH:

-8-

**CIVIL COVER SHEET**

**97-3960**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I (a) PLAINTIFFS

COMPUTERIZED THERMAL IMAGING, INC.
a Nevada corporation

## DEFENDANTS  CIV-NESBITT

SELECT CAPITAL ADVISORS, INC., RONALD G.
WILLIAMS, GARY T. WILLIAMS, LYLE MORTENSON
BARRY GLUSKER, MANNY LOPEZ, WALTER
KOLKER, HARI JOHNSON, SHELDON TAIGER,
ARITEX, LTD. etc.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

A DADE/97cv3960-LCN-LRJ

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Dade
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Thomas R. Spencer, Jr.
SPENCER & KLEIN, P.A.
801 Brickell Avenue, Suite 1901
Miami, FL 33131 (305) 374-7700

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:
MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

IVa. _____ days estimated (for both sides) to try entire case.

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | B FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R.& Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **B SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | B ☐ 380 Other Personal Property Damage | **A LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | B ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **A CIVIL RIGHTS** | **B PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| B ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus | ☐ 790 Other Labor Litigation | **A FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | B ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☒ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| B ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

## VI. ORIGIN (PLACE AN x IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Refiled
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $  75,000.00

Check YES only if demanded in complaint:
**JURY DEMAND:**  ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):
JUDGE _____  DOCKET NUMBER _____

DATE  12/9/97
SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT
S/F  I-2
REV. 6/90

FOR OFFICE USE ONLY  Receipt No. 685581  Amount: 150.00
Date Paid: 12/05/97  M/ifp: _____